Slip Op. 18-172

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HARTFORD FIRE INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>    Defendant. | Before: Leo M. Gordon, Judge<br><br>Court No. 11-00135 |

**OPINION**

[Plaintiff's motion for summary judgment denied; Defendant's cross-motion for summary judgment granted.]

Dated: December 14, 2018

Frederick D. Van Arnam, Jr., Barnes, Richardson & Colburn, LLP of New York, NY for Plaintiff Hartford Fire Insurance Company.

Edward F. Kenny and Beverly A. Farrell, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of New York, NY for Defendant United States. With them on the briefs were Joseph H. Hunt, Assistant Attorney General, and Amy M. Rubin, Assistant Director. Of counsel on the briefs was Paula S. Smith, Attorney, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection of New York, NY.

    Gordon, Judge: Plaintiff Hartford Fire Insurance Company ("Hartford") challenges the denial of its protests of demands by U.S. Customs and Border Protection ("Customs" or "CBP") for payment of antidumping duties on certain surety bonds. Before the court are cross-motions for summary judgment by Hartford and Defendant United States ("Defendant" or the "Government"). See Pl.'s Mot. for Summ. J., ECF No. 61 ("Pl.'s Br."); Def.'s Mem. of Law Resp. to Pl.'s Summ. J. Mot. & Supp. Def.'s Cross-Mot. for Summ.

J., ECF No. 69 ("Def.'s Br."); Pl.'s Reply Supp. Mot. for Summ. J. & Resp. to Def.'s Cross-Mot. for Summ. J., ECF No. 74 ("Pl.'s Reply"); Def.'s Reply Supp. Cross-Mot. for Summ. J., ECF No. 80 ("Def.'s Reply"). The court has jurisdiction pursuant to 28 U.S.C. § 1581(a) (2012). For the reasons set forth below, Plaintiff's motion for summary judgment is denied, and Defendant's cross-motion is granted.

## I. Undisputed Facts

The following facts are not in dispute. See generally Pl.'s Br. at 4–7 ("Pl.'s Stmt. of Material Facts Not in Issue"); Def.'s Resp. to Pl.'s Stmt. of Material Facts Not in Issue, ECF No. 70; Def.'s Stmt. of Add'l Material Facts Not in Issue, ECF No. 71; Pl.'s Resp. to Def.'s Stmt. of Material Facts Not in Issue, ECF No. 75. Shandong Longtai Fruits and Vegetables Co., Ltd. ("Shandong Longtai") imported fresh garlic from China in five entries in June, July, and August 2006 ("subject entries"). Pl.'s Stmt. of Material Facts Not in Issue ¶¶ 1, 2. At that time, the imported garlic was covered by an antidumping duty order. See id. ¶ 4 (citing Fresh Garlic from the People's Republic of China, 59 Fed. Reg. 59,209 (Dep't of Commerce Nov. 16, 1994) ("Order")). Concomitantly, Shandong Longtai was the subject of a new shipper review before the U.S. Department of Commerce ("Commerce"). Id. ¶ 3 (citing Fresh Garlic from the People's Republic of China, 72 Fed. Reg. 34,438 (Dep't of Commerce June 22, 2007) (final results and partial rescission of 11th admin. rev. and new shipper revs.)).

For each entry, Shandong Longtai did not deposit cash to cover the estimated antidumping duties, but rather provided single entry bonds ("SEBs" or "subject bonds") in lieu of cash deposits. Id. ¶¶ 5, 6. Hartford was the surety on these SEBs, see id. ¶ 7,

and also on a continuous bond covering the subject entries, see Def.'s Stmt. of Add'l Material Facts Not in Issue ¶ 2. Customs demanded, but never received, cash deposits from Shandong Longtai to cover the estimated antidumping duties owed on the subject entries. Pl.'s Stmt. of Material Facts Not in Issue ¶¶ 12, 14.

Liquidation of the subject entries was suspended during the pendency of the 12th administrative review of the Order. Id. ¶ 8. As of the dates of entry of the subject entries, and prior to their liquidation, Congress enacted the Pension Protection Act of 2006, Pub. L. 109–280, 120 Stat. 780 (Aug. 17, 2006) ("PPA"). Id. ¶ 9. Thereafter, Commerce published the final results of the 12th administrative review. See id. ¶ 15 (citing Fresh Garlic from the People's Republic of China, 73 Fed. Reg. 34,251 (June 17, 2008) (final results 12th admin. rev.) ("Final Results")).

Pursuant to the Final Results, Customs calculated the final amount of antidumping duties owed by Shandong Longtai on the subject entries, and demanded that Shandong Longtai pay that amount. Id. ¶¶ 16, 17. Shandong Longtai failed to pay the final duties. Id. ¶ 18. Customs then issued demands ("Demands") to Harford that it, as Shandong Longtai's surety, pay the antidumping duties owed. Id. ¶ 19. Hartford protested the Demands, which Customs denied. Id. ¶¶ 20, 21. Subsequently, Hartford paid the outstanding antidumping duties, thereby satisfying the Demands. Id. ¶ 22.

## II. Standard of Review

The U.S. Court of International Trade reviews Customs' protest decisions de novo. 28 U.S.C. § 2640(a)(1). USCIT Rule 56 permits summary judgment when "there is no genuine issue as to any material fact." USCIT R. 56(c); see also Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986). In considering whether material facts are in dispute, the evidence must be considered in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Anderson, 477 U.S. at 261 n. 2. Because the dispositive issues are solely legal and the material facts are uncontroverted, summary judgment is appropriate. See 10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman, Federal Practice & Procedure § 2725 (4th ed. 2018); see also Dal–Tile Corp. v. United States, 24 CIT 939, 944, 116 F. Supp. 2d 1309, 1314 (2000) (citing Marathon Oil Co. v. United States, 24 CIT 211, 214, 93 F. Supp. 2d 1277, 1279–80 (2000)).

### III. Discussion

At the time of the subject entries, Shandong Longtai, as the importer, had the option to forgo payment of cash deposits of estimated antidumping duties by posting a bond until a new shipper review established a duty margin specific to it as the foreign producer and exporter. See Section 751(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675(a)(2)(B)(iii)[1] (the "new shipper bonding privilege") (Customs was authorized "to allow, at the option of the importer, the posting until the completion of the review, of a bond or security in lieu of a cash deposit for each entry of the subject merchandise."). Subsequently, the PPA suspended the new shipper bonding privilege. While the PPA, as a whole, applied only "to goods entered, or withdrawn from

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition, unless otherwise indicated.

warehouse for consumption, on or after the 15th day after the date of the enactment" of the PPA (September 1, 2006), see PPA § 1641, 120 Stat. at 1172, Congress provided for limited retroactive effect for the statutory revocation of the new shipper bonding privilege. Specifically, the PPA provided that the new shipper bonding privilege "shall not be effective during the period beginning on April 1, 2006, and ending on June 30, 2009."[2] See PPA § 1632, 120 Stat. at 1165 ("retroactive period").

The day after the PPA's enactment, Customs issued a memorandum that provided guidance on the collection of antidumping duties from new shippers. See Pl.'s Br. at Ex. 1 (Cathy Sauceda, CBP Director of Special Enforcement, Suspension of Antidumping and Countervailing Duty Bonding Privilege for New Shippers from 04/01/2006 to 06/30/2009, CSMS #06-000983 (Aug. 18 2006) ("Sauceda Memo")). The Sauceda Memo stated that "CBP shall collect a cash deposit of estimated antidumping and countervailing duties from importers for each entry of merchandise made during the conduct of all new shipper reviews . . . entered or withdrawn from warehouse for consumption on or after 04/01/2006, for which a bond was collected as security." Sauceda Memo ¶ 5. Pursuant to this memorandum, Customs sought to collect antidumping duties from Shandong Longtai and from Hartford as Shandong Longtai's surety, which Hartford subsequently paid.

Thereafter, Hartford brought suit challenging Customs' Demands, raising four arguments as to why it should not be held liable as a surety on Shandong Longtai's SEBs. See Pl.'s Br. at 14–20. Principally, Plaintiff argues that the retroactive effect of the PPA

---

[2] The new shipper bonding privilege has since been repealed. See 19 U.S.C. § 1675 (2012).

nullified the validity of the SEBs and prohibited Customs from issuing the Demands predicated on the subject bonds. Id. at 14–16. Second, Plaintiff contends that the subject SEBs "are creatures of statute," and that "passage of the [PPA], and the resulting change in the statutory scheme, rendered the bonds unenforceable." Id. at 16–17. Third, Plaintiff argues that Customs' Demands stem from its "ministerial" role in effectuating the antidumping laws, and that the PPA's retroactive elimination of the new shipper bonding privilege "removed Commerce's authority to allow Customs to accept bonds in lieu of cash deposits" as of April 1, 2006. Id. at 17–18. Lastly, Plaintiff maintains that the retroactive elimination of the new shipper bonding privilege implicitly obligated Customs to seek cash deposits from Shandong Longtai to replace the security formerly provided by the SEBs. Id. at 18–20. Because the court disagrees that the passage of the PPA rendered the subject bonds unenforceable, the court denies Plaintiff's motion and grants Defendant's motion for summary judgment.

### A.  Nullification of the Subject Bonds

Section 1632(a) of the PPA provides that "[the new shipper bonding privilege] shall not be effective during the period beginning on April 1, 2006, and ending on June 30, 2009." PPA, § 1632, 120 Stat. at 1165–66. Plaintiff's primary argument is that § 1632 nullified bonds issued during the retroactive period. See Pl.'s Br. at 14–16 ("the SEBs were rendered ineffective by the [PPA]"). The Government disagrees and maintains that § 1632 does not nullify Hartford's liability under the subject bonds. The Government emphasizes that the purpose of the statute, as expressed in its text, as well as its legislative history, does not support Hartford's arguments. Resolution of the parties'

dispute hinges on the interpretation of § 1632 and the effect of the retroactive suspension of the new shipper bonding privilege on the subject bonds.

In determining the meaning of a statute, "[t]he first and foremost 'tool' to be used is the statute's text, giving it its plain meaning." Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998). Hartford appears to concede that the text of the statute is silent as to the question of nullification. Hartford does not rely upon the "plain meaning" of § 1632, but rather argues that the court should infer nullification of the subject bonds solely from the fact that the subject entries were made during the retroactive period. This the court will not do as Hartford's hoped-for interpretation goes well beyond the express text and runs contrary to the intent of § 1632.

In support of its preferred interpretation, Hartford relies on Vandegrift Forwarding Co. v. Hartford Fire Ins. Co., No. 06-CV-5440, 2009 WL 928337 (E.D.N.Y. Mar. 31, 2009), for the proposition that once the PPA was enacted into law, the SEBs posted by Shandong Longtai were no longer valid security for the Government. See Pl.'s Br. at 10, 14. The plaintiff in Vandegrift was a freight forwarder and customs broker who had obtained bonds from Hartford on behalf of 26 shippers. Vandegrift brought an action to recover premiums paid by its clients to Hartford for bonds issued during the retroactive period on the grounds that the bonds were rendered unenforceable by the PPA. Vandegrift, No. 06-CV-5440, 2009 WL 928337 at *1.

In dismissing the action for lack of Article III standing, the court did not address the enforceability of the bonds. See id. at *3–*6 (holding that Vandegrift's shippers were only parties that could bring claims against Hartford for premiums paid on bonds). Rather, the

court described the unenforceability of the bonds as a fact alleged by Vandegrift that was assumed to be true for the purposes of deciding Hartford's motion to dismiss. See id. at *1–*2 ("When considering a motion to dismiss under Rule 12(b)(6), the Court accepts as true the factual allegations in the complaint and draws all inferences in favor of the plaintiff."). Specifically, the court noted that "[a]ccording to Vandegrift, its clients paid premiums totaling $839,548 for bonds that were rendered ineffective by [the PPA] …." Id. at *1. Accordingly, Plaintiff's reliance on Vandegrift is misplaced.

Hartford further argues that if Customs could still make demands on bonds posted during the retroactive period, the April 1, 2006 effective date of § 1632 would "be rendered entirely superfluous." Pl.'s Br. at 14. The court disagrees. Hartford contends that "Congress chose, in strong, clear and imperative language, retroactively to eliminate importers' ability to post bonds, and to require that Customs obtain cash deposits as security for entries made on or after April 1, 2006." See Pl.'s Reply at 9. This is simply not the case. While Hartford is correct that § 1632(a) retroactively eliminated the option for new shippers to post bonds, the statute says nothing about any requirement on Customs to obtain cash deposits retroactively. Section 1632(a) also does not address whether Customs could continue to rely upon bonds posted by importers during the retroactive period under the new shipper bonding privilege.

In response, the Government notes that the legislative history is silent as to the purpose behind making the provision retroactive, but Congress' intention may have been to require new shippers to post cash deposits retroactively to April 1, 2006 despite having previously posted bonds as securities for antidumping liability. See Def.'s Resp. at 24

(proposing interpretation of § 1632 that would limit rights of new shippers but preserve rights of Customs with respect to new shipper bonds posted in retroactive period). Under the Government's interpretation, the retroactive limitation on the rights of new shippers under § 1632 may occur without altering the privileges and obligations maintained by the Government in enforcing the antidumping laws. This approach appears to give meaning to both the retroactive effective date as well as the intent behind § 1632. See infra at pp. 9–10 (discussing intent and purpose of § 1632). Ultimately, Hartford has failed to persuade the court that it must interpret § 1632 to prohibit Customs from making demands on bonds posted during the retroactive period in order to avoid rendering the effective date of § 1632 "entirely superfluous."

Hartford's proposed interpretation of § 1632(a) is also at odds with the statute's purpose. Section 1632(b) explicitly requires a report on the impact of § 1632(a), stating that one "of the difficulties that necessitated the suspension [of the new shipper bonding privilege]" was a "problem in the collection of antidumping duties on imports from new shippers." PPA, § 1632(b)(2)(A), 120 Stat. at. 1165. Suspension of the new shipper bonding privilege was enacted largely as a result of the significant loss of revenue attributed to new shippers of merchandise subject to antidumping duty orders. See, e.g., Def.'s Br. at Ex. 10, U.S. Gov't Accountability Office, GAO-05-979, International Trade: Issues and Effects of Implementing the Continued Dumping and Subsidy Offset Act 24–28 (2005) (noting Congressional consideration of legislation to address difficulties faced by Customs in collecting antidumping duties from "new shippers"); id. at Ex. 11, Regional Farm Bill: Field Hearing Before the S. Comm. on Agriculture Nutrition, and the Forestry,

Statement of the American Honey Producers Associations, Inc., 109th Cong. (2006) ("… importers from so-called 'new shippers' could secure deposits of estimated AD duties by posting bonds instead of making cash deposits. Importers often closed shop and 'skipped out' on these bonds, making it difficult for [Customs] to collect duties and severely weakening the deterrent effect of the AD order."). Hartford's proposed interpretation of the PPA is inconsistent with the goal of facilitating the collection of antidumping duties. Adoption of Plaintiff's interpretation would have the effect of <u>increasing</u> the non-collection of antidumping or countervailing duties. Hartford cites no legislative history or other authority supporting its argument that, by enacting the PPA, Congress intended to relieve sureties of their obligations on bonds posted during the retroactive period and held by Customs.

Lastly, Hartford relies on Customs' communications about the collection of antidumping duties owed by Shandong Longtai, contending that Customs represented and acknowledged that it had no ability to continue to rely on and demand payment against new shipper bonds. Pl.'s Br. at 13. Specifically, Hartford points to the Sauceda Memo as a formal adoption of this position by Customs. The court again disagrees. The Sauceda Memo does not provide a representation by Customs that bonds executed during the retroactive period were unenforceable. Instead, the Sauceda Memo states that:

> Section 1632 of H.R. 4 (suspension of new shipper review provision) temporarily suspends the authority of the U.S. Department of Commerce (Commerce) to instruct U.S. Customs and Border Protection (CBP) to collect a bond or other security in lieu of a cash deposit of estimated antidumping and countervailing duties for each entry of

> subject merchandise during the period 04/01/2006, through 06/30/2009.
>
> …
>
> CBP shall collect a cash deposit of estimated antidumping and countervailing duties from importers for each entry of merchandise made during the conduct of all new shipper reviews, except as indicated above, entered or withdrawn from warehouse for consumption on or after 04/01/2006, for which a bond was collected as security.

Sauceda Memo ¶¶ 1, 5. While the memorandum confirms that Customs sought to collect cash deposits, the Sauceda Memo is silent as to the enforceability of bonds that were already posted with Customs.

Hartford also relies on a letter dated February 5, 2007 from Robert Hamilton, Director of Customs' Revenue Division, to Shandong Longtai, stating:

> For the reasons discussed below, the single transaction bond(s) that you posted in lieu of said deposit(s) are no longer acceptable, as a matter of law.
>
> …
>
> Remitting $8,930,468.96 in a timely manner will release the single transaction bond(s) that were posted in lieu of a cash deposit(s) of dumping or countervailing duties. Release of the respective bonds should result in return of security required by the surety, if any, that you posted to obtain the bond(s). CBP cannot guarantee what your surety(s) will do regarding the security they have required. However, CBP holds it within its unilateral power to release the single transaction bond(s) involved.

See Pl.'s Br. at Ex. 2 ("Hamilton Letter"). It is clear from the context of the entire letter that the phrase "as a matter of law" refers to § 1632, which suspended the privilege of an importer, like Shandong Longtai, to post a bond. The letter does not reflect Customs' belief or position that the subject bonds were unenforceable. Id.

Plaintiff incorrectly describes the language in the Hamilton Letter as a "party admission" that the bonds are unenforceable. See Pl.'s Br. at 13. The language of the Hamilton Letter confirms Customs' position that the bonds remained enforceable, otherwise Customs' warning that it maintained "unilateral power to release the single transaction bond(s) involved" would be meaningless. See Hamilton Letter. Customs' position that Shandong Longtai could no longer rely upon the SEBs as providing sufficient security under the statute is altogether different from stating that the subject bonds were rendered unenforceable by the PPA. Accordingly, the court concludes that neither the Sauceda Memo nor the Hamilton Letter support Hartford's argument that the subject bonds are null and void.

Ultimately, Hartford's position hinges on an interpretation of the PPA that bonds tendered to Customs between April 1, 2006 and August 17, 2006 were nullified upon enactment of the statute. However, the court's review of the statutory text, purpose, and the legislative history of the PPA reveals no support for Hartford's proffered interpretation. Interpreting § 1632 as proposed by Hartford would run contrary to Congressional intent and result in additional revenue loss for Customs. See Def.'s Br. 20–24. Accordingly, the PPA's suspension of the new shipper bonding privilege did not operate to nullify the subject bonds.

### B. "Statutory" Bonds

Next, Hartford argues that the subject bonds are unenforceable because they are "statutory bonds" or "creatures of statute." Pl.'s Br. at 16. Hartford contends that statutory bonds must be interpreted with reference to all applicable statutes and regulations insofar

as they are found to modify the rights of the parties. However, Hartford fails to accurately characterize the subject bonds. SEBs are contracts under which an importer (the bond's principal and primary obligor) and a surety (the bond's secondary obligor) agree, jointly and severally, to pay the United States (the bond's sole identified beneficiary) all duties, taxes, and charges found due on an entry secured by the bond. See Sioux Honey Assoc. v. United States, 672 F.3d 1041, 1058 (Fed. Cir. 2012). Customs has broad authority to request bonds, see 19 U.S.C. §1623 and 19 C.F.R. Part 113, but the obligations created by the bonds are established by the contractual terms of the bonds themselves, and not defined by statute. Though the terms of bonds may reference Commerce's regulations, that does not mean that the bonds are "statutory" in nature or that they depend upon the maintenance of the statutory and regulatory framework under which they were written in order to remain enforceable.

While new shipper bonds were authorized by 19 U.S.C. § 1675(a)(2)(B)(iii), their use and creation were not required under the plain language of that statute. The new shipper bonding privilege gave the importer the option to submit a bond in lieu of a cash deposit, but did not set any bonding conditions, or address the underlying enforceability of bonds. Because the PPA does not address or modify the obligations undertaken by Hartford pursuant to the SEBs, the terms of those bonds, which embody the contractual agreement between the surety and principal, remain in full force.

**C. Authority to Demand Payment on the Subject Bonds**

Third, Hartford argues that § 1632's "suspension of the new shipper bonding privilege removed Commerce's authority to allow Customs to accept bonds in lieu of cash

deposits." Pl.'s Br. at 17. Hartford contends that because § 1632 suspended the new shipper bonding privilege retroactively to April 1, 2006, Commerce, and in turn, Customs, lacked authority to require anything other than cash deposits from importers to cover antidumping duties on or after that date. Hartford further maintains that the Demands for payment on the SEBs constituted unlawful charges or exactions because Customs retroactively lost its authority to accept or demand payment against the subject bonds pursuant to § 1632. Id. at 17, 18. The court again disagrees. Congressional enactment of § 1632 revoked the new shipper bonding privilege, but did not alter the authority of Commerce regarding bonds previously posted pursuant to that privilege.

The language of the new shipper bonding privilege stated that Commerce "shall, at the time a review under this subparagraph is initiated, direct the Customs Service to allow, at the option of the importer, the posting, until the completion of the review, of a bond or security in lieu of a cash deposit." See 19 U.S.C. § 1675(a)(2)(B)(iii). The instructions that Commerce issued to Customs are unambiguous—"[f]or shipments of fresh garlic from the PRC grown by and exported by the following companies [including Shandong Longtai], entered, or withdrawn from warehouse, for consumption in the United States on or after December 28, 2005, a bond or other security deposit is permitted, at the importer's option" and "[t]he option of a bond in lieu of a cash deposit will remain in effect for exports from the exporter/grower combinations identified above until publication of the final results of these new shipper reviews." See Def.'s Br. at Ex. 1 (Message No. 6020205 from Commerce's Director, Special Enforcement to Customs' Directors of Field Operations and Port Directors (Jan. 20, 2006)).

Customs follows Commerce's instructions regarding antidumping duties. See, e.g., Mitsubishi Elecs. Am., Inc. v. United States, 44 F.3d 973 (Fed. Cir. 1994) (calculation of antidumping duties is performed by Commerce and involves no decision by Customs); UniPro Foodservice, Inc. v. United States, 32 CIT 1004, 577 F. Supp. 2d 1348 (2008) (Customs' role in liquidating entries subject to dumping order merely ministerial, and Customs has no discretion in the matter). In accordance with Commerce's instructions, as well as the requirements of § 1675(a)(2)(B)(iii) then in effect, Customs properly accepted SEBs for the subject entries.

The Government does not dispute that Customs' role in the administration of the antidumping or countervailing duty law is ministerial. See Def.'s Br. at 9–10. Here, Customs followed Commerce's instructions in permitting Shandong Longtai to post bonds in lieu of cash deposits at the time of entry. And, Commerce issued no additional instructions directing Customs to cancel or consider unenforceable new shipper bonds executed during the retroactive period. While Plaintiff may wish the court to infer from Commerce's silence on this issue that Commerce intended for Customs to cancel those bonds, the court concludes that if Commerce intended that result, it would have said so expressly. It did not.

### D.  Customs' Obligation to Collect Cash Deposits

Lastly, Hartford argues that the PPA required Shandong Longtai to make retroactive cash deposits on the subject entries, and that Customs was required to collect those cash deposits instead of demanding payments from Hartford. Pl.'s Br. at 17, 18. Assuming the bonds were nullified by the PPA, Hartford contends that Customs was

required to obtain the outstanding antidumping duties directly from Shandong Longtai instead of relying on payment from Hartford as the surety. Id. at 15, 16. Hartford argues that in the absence of an express directive from Congress indicating that Customs could continue to rely upon bonds issued during the retroactive period of § 1632, the enactment of § 1632 implicitly required Customs to obtain payment of all antidumping duties in cash solely from the importers. Id. at 19-20. Once again, the court disagrees. The PPA is silent about: (1) any obligation on the part of Customs to collect cash deposits on entries filed during the retroactive period; and (2) the enforceability of new shipper bonds filed with Customs during the retroactive period, but prior to the date of enactment of the PPA. Hartford reads more into the PPA than is there, and the court cannot, given what the PPA does say, absolve Hartford's liability as surety on the subject bonds.

Hartford further contends that once Commerce issues an antidumping order, Customs, pursuant to 19 U.S.C. § 1673g(a), must collect a cash deposit of the estimated duties as security on entries of merchandise subject to an antidumping duty order, and Customs may accept a bond in lieu of cash only if a specific exception exists. Pl.'s Br. at 7. Hartford also contends that once the new shipper bonding privilege was revoked, Customs was obligated under § 1673g(a) to collect cash deposits. Once again, the court disagrees.

Section 1673g(a) provides:

> . . . no customs officer may deliver merchandise of that class or kind to the person by whom or for whose account it was imported unless that person complies with the requirements of subsection (b) of this section and deposits with the

> appropriate customs officer an estimated antidumping duty in
> an amount determined by the administering authority.

19 U.S.C. § 1673g(a) (2012). This section states that Customs shall not deliver merchandise subject to antidumping duties unless a cash deposit is made. By its express terms, § 1673g(a) relates only to the time at which Customs "delivers merchandise." Id. It is not a general requirement that Customs seek cash deposits at any other time. At the time the merchandise was delivered (i.e., entered and released), Customs could not and did not violate § 1673g(a) because the new shipper bonding privilege was in effect and a bond was lawfully posted.

Despite Hartford's arguments, the extent or adequacy of Customs' efforts in collecting cash deposits is not a determinative factor in determining Hartford's liability under the subject bonds. Hartford's obligations under the bonds are not contingent upon Customs' efforts vis-à-vis the principal/importer.[3] Pursuant to the terms of the subject bonds, Hartford undertook joint and several liability for the duties owed by the importer up to the bond limits. See Def.'s Br. at Ex. 2 (subject bonds stating "[i]n order to secure payment of any duty, tax or charge and compliance with law or regulation as a result of activity covered by any condition referenced below, we, the below named principal(s) and

---

[3] The court notes that Hartford's arguments in this respect are not new. The Federal Circuit previously rejected Hartford's suggestion that Customs maintains any obligation to protect the funds of sureties in administering the antidumping laws. See Hartford Fire Ins. Co. v. United States, 772 F.3d 1281, 1288 (Fed. Cir. 2014) ("Hartford's claim improperly seeks to convert Customs' obligation to protect the revenue of the United States into a duty owed to Hartford and impermissibly shift the responsibility for assessing a surety's risk from the surety to the Government. Customs was not required to assess Hartford's exposure to risk.") (internal citations omitted).

surety(ies), bind ourselves to the United States in the amount or amounts, as set forth below.").

In sum, the PPA does not alter the status of bonds already lawfully filed with Customs, or the ability of Customs to collect against those bonds.

### IV.  Conclusion

For the foregoing reasons, the court denies Plaintiff's motion for summary judgment and grants Defendant's motion for summary judgment. The court will enter judgment accordingly.

<div style="text-align: right">

/s/ Leo M. Gordon
Judge Leo M. Gordon

</div>

Dated: December 14, 2018
      New York, New York